**UNITED STATES DISTRICT COURT**
**WESTERN DIVISION OF LOUISIANA**
**SHREVEPORT DIVISION**

DADRIEN UPDITE, ET AL.                    CIVIL ACTION NO. 06-0593

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

DELTA BEVERAGE GROUP, INC.                MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court are cross Motions for Partial Summary Judgment.  See Record Document 89 & 91-92.   The defendant, Delta Beverage Group, Inc., moved for summary judgment on the day rate versus hourly rate claim; the retaliation claims; and the "meal period" claim of five specific merchandisers.  See Record Document 89.  The defendant also moved for summary judgment on an issue related to the "hours worked" claim, seeking a ruling that it accurately recorded the hours worked by the merchandisers on weekdays.  See id.  The plaintiffs opposed the defendant's Motion for Partial Summary Judgment and also moved for summary judgment on the following issues:   the defendant pays merchandisers hourly; the defendant made improper deductions for meal periods; the defendant did not pay the merchandisers for all overtime hours worked; there is a causal connection between the merchandisers' complaint and subsequent adverse treatment; and the defendant's proffered reasons for adverse treatment are pretext.  See Record Document 92.   For the reasons which follow, the Motion for Partial Summary Judgment filed by Delta Beverage Group, Inc. is **GRANTED IN PART AND DENIED IN PART** and the Motion for Partial Summary Judgment filed by the plaintiffs is **DENIED**.

## BACKGROUND

The plaintiffs, Dadrien Updite ("Updite"), Michael Russell ("Russell"), Jeff Sheppard ("Sheppard"), David Pugh ("Pugh"), Anteaus Stewart ("Stewart"), and Ernest Goldston ("Goldston"), brought this action pursuant to the collective action provision of the Fair Labor Standards Act ("FLSA"). See Record Document 58, ¶8.[1] The plaintiffs and the putative action members are similarly situated in that they are current and/or former "merchandisers" for the defendant, Delta Beverage Group, Inc. (hereinafter referred to as "Pepsi"). See id., ¶ 9. The merchandisers allege that they "were required to work hours in excess of 40 hours in one or more workweeks for which they were not properly compensated in accordance with the FLSA." See id., ¶¶ 22, 27-33. Updite, Russell, and Sheppard also allege that immediately after Pepsi received notice of the instant lawsuit, management began a systematic campaign of retaliation against them. See id., ¶¶ 24-26, 34-39. The Court now moves to a recitation of facts relevant to the instant motions.[2]

Merchandisers are employees whose job duties include visiting Pepsi accounts, such as grocery stores, to make sure that Pepsi products are neatly placed and displayed on store shelves and in store coolers. They commute to and from work in their own vehicles but, to get from one account to another on their assigned routes, the merchandisers drive company-owned vehicles.

---

[1] The complaint was filed, and amended, in April 2006. See Record Documents 1, 3, & 16. A third amended complaint was filed in January 2007. See Record Document 58.

[2] The merchandisers stipulated to many of Pepsi's Statement of Undisputed Material Facts. See Record Document 92-2 at 1. Citations are provided for only those facts disputed. See id.

Some of the merchandisers are scheduled to work only on weekdays while others are scheduled to work one or both weekend days. Both the workweek and pay period begin on Sunday morning and end the following Saturday night. When the merchandisers work on a weekday, they use a time clock to clock in at the beginning of their workday and to clock out at the end of their workday. Their beginning and ending work times, registered by the time clock on weekdays, are recorded in one of Pepsi's payroll systems called Kronos.[3] Pepsi contends that at all times relevant to this lawsuit, the merchandisers were paid a day rate for each day that they worked in the workweek, regardless of how many hours they worked on each of those days. Conversely, the merchandisers argue that they were paid an hourly rate during the relevant time period of this lawsuit. Specific facts relating to the day rate versus hourly rate claim are set forth more fully below.[4]

Updite was hired by Pepsi in February 2005. Throughout his employment, Updite worked as a merchandiser in Shreveport. In December 2005, he was mugged. After the mugging, Updite began to faint or "black out." In February 2006, he was involved in a serious vehicular accident after he blacked out. Not only did this accident occur during work time, but it occurred while Updite was driving a Pepsi-owned vehicle.

Soon after the accident, Updite was medically released by a physician to return

---

[3]The computer programs used by Pepsi to administer time, i.e., hours worked, and payroll are called "PeopleSoft" and "Kronos."

[4]As discussed more fully in the Law and Analysis section of the instant ruling, the issue of day rate versus hourly rate is key to the resolution of this case because day rate employees are entitled to extra half-time pay for all hours worked in excess of 40 in the workweek, while hourly rate employees are entitled to extra time-and-a-half pay for all hours worked in excess of 40 in the workweek.

to work with several restrictions, including the restriction of "NO DRIVING." He subsequently visited another physician who, on February 27, 2006, released him to work without any restrictions. The next day, Updite went to the emergency room, suffered a seizure that was witnessed by a physician, and refused admission to the medical facility, causing the physician to write that Updite "can not be released to drive." On March 27, 2006, the same physician who had released Updite on February 27, 2006, wrote, "Mr. Updite has been released for work from our standpoint; however, he cannot be released to drive until neurology has cleared him for such."

Updite subsequently visited a neurologist, Dr. Warren Long ("Dr. Long"), and in a document dated April 10, 2006, Dr. Long stated that he could see no reason why Updite could not work, so long as Updite was taking a particular drug. Dr. Long did not mention specifically mention driving in the April 2006 document. When Updite returned to see Dr. Long just a few weeks later, Dr. Long entered "seizure disorder" as the diagnosis and stated that he was "not sure" as to whether Updite had suffered yet another, more recent seizure. After confirming with Dr. Long that Updite was released to drive, Updite was allowed to work and drive a Pepsi vehicle in or around April, May, and early June 2006. See id., Exhibits 12 & 17.

By mid-2006, Updite's condition was reviewed by Dr. Alireza Minagar ("Dr. Minagar") with the LSU Health Sciences Center in Shreveport. After his review, Dr. Minagar wrote:

> Based on my professional opinion, patient should not drive Pepsi trucks anymore and should not work in the capacity of a driver or someone who should work with heavy machines. Mr. Updite can work only a desk-bound job without climbing any ladders because of the possibility of breakthrough seizures.

Id., Exhibit 21.  Concerned about Updite's safety, the safety of others on the road, the opinion by Dr. Minagar, and the legal risk/liability of allowing Updite to continue driving, Pepsi decided to assign a fellow merchandiser to drive him to and from his accounts.

Sheppard was selected as the chauffeur on most days because, according to Pepsi, his and Updite's respective routes were geographically proximate.  See id., Exhibit 1 at 98; Exhibit 8 at 149-51.  Yet, Updite contends that when he was *first* ordered to ride with Sheppard in March 2006, their respective routes were geographically opposed, meaning on opposite sides of town, and both routes had considerably high volume.  See Record Document 91, Appendix at 0196.

In July 2006, Updite did not ride with Sheppard on certain days and was sent home.  See Record Document 89, Exhibit 1 at 73; Exhibit 8 at 142-143, 146-149; Exhibit 12B.  Pepsi had its counsel send a letter to Updite's counsel, explaining Updite's refusals to work and "no call, no shows."  See id., Exhibit 12C.  On August 13, 2006, Updite was assigned to ride with a co-worker named Jarvis Rogers ("Rogers").  Rogers was running late and Updite decided "to go ahead and drive up to my account because he [Rogers] was taking too long."  Updite received a written warning for driving his own personal vehicle to an account.

On August 20, 2006, Updite was running late for work and decided to go straight from his home to a Target store account without first going to Pepsi to clock in and ride with another merchandiser in a Pepsi vehicle.  While at the Target store, Updite saw two other Pepsi personnel and an incident, the facts of which are in dispute, between Updite and one of the Pepsi personnel followed.  See Record Document 89, Exhibit 8 at 157-161, 165-171; Exhibits 12E & 12F; Record Document 91, Appendix at 0477A, 0477B.

The incident was reported to Pepsi and a meeting was held the next morning.  See Record Document 89, Exhibit 8 at 162-169, 172-173.  Updite was suspended and eventually terminated from Pepsi.  See id., Exhibit 7 at 11; Exhibit 8 at 172-173; Exhibits 12G, 12H, & 12I.

On August 30, 2006, Pepsi applied for a peace bond in city court due to Updite's "breach of the peace" in relation to the Target incident.  See id., Exhibit 7 at 10-14; Exhibit 8 at 175; Exhibit 12 at 2; Record Document 91, Appendix at 0470-0474.  Pepsi contends the peace bond application had nothing to do with Updite's lawsuit or any pay-related issues.  See Record Document 89, Exhibit 12 at 2.

Russell began employment with Pepsi as a merchandiser in Shreveport in April 2004.  In May 2005, he received a warning for poor work performance at two accounts.  Russell contends that two of his managers/supervisors, Van McKinney ("McKinney") and John Lee ("Lee"), were harassing and nit-picking him in connection with this written warning.  In September 2005, Russell received a disciplinary suspension of five working days for poor work performance at a Wal-Mart account.  As with the May 2005 written warning, Russell refused to sign the September 2005 disciplinary document.[5]

During this same time, Russell complained to Bobby Smith ("Smith"), the Region Manager at the Shreveport facility, and to Rita Weary, a Human Resources manager, that Lee considered him to be a "gang banger."  According to Russell, Lee said that Russell looked like a "thug" and "gang banger" because his shirt was not tucked in often enough.  See id., Exhibit 2 at 46-49.  A meeting was held on this issue, with Russell,

---

[5]Russell disputes much of what is written in the disciplinary documents that he received in May 2005 and September 2005.

Lee, Smith, and McKinney present. Russell believes that his September 2005 suspension was not based on disciplinary reasons, but was in retaliation for having complained of harassment by Lee.

In April 2006, Russell's employment was terminated for poor work performance. He disputes much of what is written in the disciplinary document. Lee, the decision-maker on Russell's termination, did not know about the instant lawsuit when he decided to terminate Russell.

Sheppard began employment with Pepsi as a merchandiser in Shreveport in September 2004. He is still employed with the Company today. He believes that he was retaliated against when Pepsi assigned him to chauffeur Updite around, which resulted in an increased workload. He also complains that a supervisor yelled at him one day when Updite was ready to be picked up at an account, but Sheppard was not ready to go pick him up.

In October 2006, Sheppard was offered a promotion from the merchandiser to the SSGL position. He declined the promotion because the SSGL position involved Sunday work, more stress, and additional duties that did not interest him. Pepsi also made efforts to retain Sheppard in 2006 when he threatened to leave Pepsi for a job with another company. In February 2007, Pepsi increased Sheppard's compensation. According to Pepsi, his day rate was increased from $80.40 to $84.40. See id., Exhibit 12. According to the merchandisers, Sheppard's hourly rate was increased from $10.05 to $10.55. See Record Document 91, Appendix 0483-0484.

**LAW AND ANALYSIS**

**I.      Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002).  If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

**II.     Day Rate versus Hourly Rate.**

Title 29, Code of Federal Regulations, Section 778.112 provides:

> If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

29 C.F.R. § 778.112. Section 778.112 does not require an employee's consent to its application; rather, "the triggering requirement is solely that employees are paid a day or job rate." Dufrene v. Browning-Ferris, Inc., 207 F.3d 264, 268 (5th Cir. 2000); see also Hartsell v. Dr. Pepper Bottling Co. of Tex., 207 F.3d 269, 273 (5th Cir. 2000) ("Again, the plain language of this interpretative bulletin does not require that employee and employer have a mutual understanding concerning the 'regular rate' of pay. All that is required is that employee be, in fact, paid a day-rate.").

Pepsi contends that it pays its merchandisers on a day rate basis; thus, in accordance with Section 778.112, the merchandisers are "entitled to extra half-time pay . . . for all hours worked in excess of 40 in the workweek." Id. Conversely, the merchandisers contend that Pepsi is not paying a day rate in accordance with Section 778.112, but rather is paying them an hourly rate. If paid at an hourly rate, the merchandisers are entitled to a time-and-a-half rate, not a half-time rate, for overtime hours worked. See Record Document 58, ¶¶ 10, 29. Both Pepsi and the merchandisers have moved for summary judgment based on their respective positions.

The Court finds that there are genuine issues of material fact preventing entry of summary judgment on the day rate versus hourly rate claim. Pepsi maintains, and it is true, that the triggering requirement of Section 778.112 is that an employee be, in fact, paid a day-rate. See Hartsell, 207 F.3d at 273; Dufrene, 207 F.3d at 268. Yet, the Court's review of the summary judgment record reveals factual questions in relation to whether the merchandisers were, in fact, paid a day-rate. The pay stub submitted by Pepsi references "rate" and "hours," not "day rate" or "job rate." See Record Document 89, Exhibit 28. Further, the deposition testimony and sworn declaration of Adele

McCarty ("McCarty"), Pepsi's national payroll manager, along with certain discovery responses that were verified by McCarty, present factual issues that can only be resolved through credibility determinations.  See id., Exhibits 10-11; Record Document 91, Appendix at 0002.[6]  Finally, the merchandisers have presented Updite's "2006 Compensation Statement" listing a "Current Hourly Rate" of $9.38 and a "New Hourly Rate" of $9.66.  See Record Document 91, Appendix at 0001.  These factual issues preclude entry of summary judgment.  After hearing the evidence and making the necessary credibility determinations, it will be for the jury, not the Court, to decide if the merchandisers in this case are, in fact, paid a day-rate.[7]

## III.    Retaliation Claims.

Updite, Russell, and Sheppard allege that Pepsi unlawfully retaliated against them after they filed this lawsuit in April 2006.  See Record Document 58, ¶¶ 24-25.

---

[6]The merchandisers have also filed "Objections and Motion to Strike Defendants' Summary Judgment Proof."  See Record Document 91-13.  They specifically challenge the declaration of McCarty and certain discovery responses verified by her.  See id.

The Motion to Strike is **DENIED**.  Even without McCarty's deposition testimony, her sworn declaration, and the discovery responses verified by her, the Court would have denied summary judgment on the day rate issue, as there was other summary judgment evidence creating a genuine issue of material fact.  Moreover, since the Court has denied summary judgment on this issue, the merchandisers will be free to cross-examine McCarty on the issues of personal knowledge, experience, and prior inconsistent statements during the course of the jury trial.

[7]Even if the Court denies summary judgment on the "day rate" claim, Pepsi argues that summary judgment should be granted under 29 U.S.C. § 259(a) because Pepsi's day-rate method of payment has been in good-faith conformity with, and in reliance on, 29 C.F.R. § 778.112.  Alternatively, Pepsi further argues that if summary judgment is denied, the Court should make limited rulings that (1) the two-year statute of limitations under 29 U.S.C. § 255(a) applies because any violation by Pepsi was not willful and (2) that liquidated damages under 29 U.S.C. § 260 are not appropriate.

Based on the showing made, the Court declines to grant summary judgment under 29 U.S.C. § 259(a).  Likewise, the Court will not hold that the two-year statute of limitations under 29 U.S.C. § 255(a) applies and/or that liquidated damages under 29 U.S.C. § 260 are not appropriate.  The record simply has not been fleshed out enough at this stage of the litigation for the Court to make such rulings.

Under the FLSA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).

"Retaliation claims under the FLSA are . . . subject to the McDonnell Douglas analytical framework." Kanida v. Gulf Coast Medical Personnel LP, 363 F.3d 568, 577 (5th Cir. 2004). To establish a *prima facie* case of retaliation, the plaintiff must establish that: (1) he participated in an activity protected under the FLSA; (2) he was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. See McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007); Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 624 (5th Cir. 2008). In relation to the second prong, the Supreme Court recently clarified that a retaliation claim may rest on an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from [engaging in protected activity under the FLSA]." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006) (citations and internal quotation marks omitted); see also Browning v. Southwest Research Institute, No. 07-50434, 2008 WL 3009894, *6 (5th Cir. Aug. 5, 2008) (discussing the White "materially adverse" standard in the context of an EPA – through the FLSA – retaliation claim).

If the plaintiff meets this *prima facie* burden, the defendant must then articulate a legitimate, non-discriminatory reason(s) for its materially adverse employment action. See Hagan, 529 F.3d at 624. The burden then shifts to the plaintiff to demonstrate that the proffered reason was not the real reason for the materially adverse employment

action, but was pretext for retaliation.  <u>See id.</u>

Pepsi moves for summary judgment on the retaliation claims.  Pepsi concedes that Updite and Russell meet the first two *prima facie* elements, but moves for summary judgment on the ground that they can not establish a causal connection between the protected activity and the adverse employment action.  Pepsi argues that summary judgment is appropriate as to Sheppard's retaliation claim, as he cannot establish that he was subjected to an adverse employment action and/or that a causal connection exists between the protected activity and the adverse employment action.

The merchandisers have also moved for partial summary judgment on the retaliation claims, arguing that there is a causal connection between the FLSA complaint and the subsequent adverse treatment of Updite, Sheppard, and Russell.  They also contend that Pepsi's proffered reasons for the adverse treatment are a pretext to retaliation for their wage claims.

### A. Updite.

Updite claims that he was retaliated against by the chauffeuring arrangement, which resulted in an unduly burdensome route; harassment regarding a medical work release; and Pepsi's application for a peace bond in city court.  The Court finds that there are genuine issues of material fact preventing summary judgment as to Updite's retaliation claims.

Summary judgment is not appropriate as to the first allegation of retaliation because there are questions of fact and credibility surrounding whether the respective routes of Sheppard and Updite were geographically "proximate" or "opposed."  Updite contends that when he was first assigned to ride with Sheppard in March 2006, their

routes were geographically opposed, meaning on the opposite ends of town, and both routes had high volume. This factual issue is made more difficult when the Court considers that the Merchandiser Worksheets, which would show the respective routes, are no longer in existence. The Court believes that these disputed facts can only be resolved after the jury hears and views the witnesses, such that credibility determinations can be made in the absence of business records showing the routes. Only then will the jury be able to decide if the chauffeuring arrangement was an adverse employment action, that is, a materially adverse action that might dissuade a reasonable worker such as Updite from engaging in activity protected by the FLSA.

The record is clear that Updite suffered from serious medical issues beginning in December 2005. His retaliation claim particularly focuses on alleged harassment regarding a medical work release:

> Rather than accept Dr. Long's unequivocal and undisputed neurological opinion that Updite could drive a vehicle, Pepsi sought to get rid of Updite in direct retaliation for his wage claim by requiring him to obtain yet another neurological opinion from none other than Pepsi's insurance-sponsored doctor, Dr. Alireza Minagar of LSU Health Sciences Center. Of course, Dr. Minagar determined that Updite should not drive a vehicle, thus laying the groundwork for Updite's ultimate – and presumably retaliation-free – termination.

Record Document 91 at 23. Again, the Court finds genuine issues of material fact preventing summary judgment on this retaliation claim. Namely, the Court notes the confusion surrounding what prompted Pepsi's decision to have Dr. Minagar "review"[8] Updite's medical records. Pepsi contends that it was entitled to send Updite to its own doctor in response to a worker's compensation claim filed by Updite in mid-2006. See

---

[8]Updite testified in his deposition that Dr. Minagar did not examine him and that he based his opinion on the medical records of Updite's neurologist, Dr. Long, who had released Updite to drive. See Record Document 91, Appendix at 0477.

Record Document 89, Exhibit 12. Yet, Updite contends that he filed no such claim and Pepsi has produced no documentary evidence to support its position. <u>See</u> Record Document 92-2 at ¶¶ 56-57. In fact, in its reply, Pepsi now claims that it initiated the worker's compensation claim. <u>See</u> Record Document 102 at 14 n. 7. In light of the factual issues surrounding Pepsi's motivation in asking Dr. Minagar to review Updite's medical records, summary judgment must be denied.

Finally, the Court moves to Updite's claim that Pepsi's retaliation continued outside of the workplace when it filed an application for a peace bond in city court due to his "breach of the peace" in relation to the Target incident. The Target incident occurred on or about August 20, 2006; yet, the peace bond was not filed until August 30, 2006, some 10 days after the incident. The trier of fact would be free to draw inferences from the timing of Smith's[9] filing of the peace bond application and the drawing of such inferences would likely depend on witness credibility. Pepsi contends that the filing of the peace bond application could not have constituted a materially adverse employment action because it occurred after Updite's separation from employment. The Court disagrees based on the <u>White</u> court's lengthy and learned discussion of anti-retaliation provisions.

In <u>White</u>, the Supreme Court reasoned that employers "can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." <u>White</u>, 548 U.S. at 63, 126 S.Ct. at 2412. The <u>White</u> court further noted that anti-retaliation provisions, unlike the substantive provisions, are ***not*** limited to discriminatory actions that affect the terms and conditions

---

[9]Smith is a current Key Account Manager for Pepsi who previously worked as a Region Manager at the Shreveport facility.

of employment. <u>See id.</u> at 64; 126 S.Ct at 2412-2413. The Court was also cognizant of broad interpretations of anti-retaliation provisions, including protection against adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party *or others* from engaging in protected activity. <u>See id.</u> at 61, 66; 126 S.Ct. at 2411, 2413. This reasoning lead to the ultimate conclusion that a retaliation claim may rest on an action that a reasonable employee would have found to be materially adverse, which in this context means it well might have dissuaded a reasonable worker from engaging in protected activity. <u>See id.</u> at 68; 126 S.Ct. at 2415.

Based on the rationale set forth in <u>White</u>, the Court finds that Updite has come forward with enough evidence to allow his retaliation claim based on the filing of the peace bond to proceed to trial. This Court believes that a reasonable trier of fact could conclude, after weighing the evidence and the credibility of witnesses, that the filing of the peace bond was an adverse employment action, as such action might have deterred Updite from pursuing his FLSA claims and/or other merchandisers from engaging in similar protected activity. Summary judgment must be denied.

**B.    Sheppard.**

Sheppard is not alleging retaliatory discharge, as he is still employed with Pepsi. Instead, he claims that he was retaliated against (1) when he was required to chauffeur Updite around, and (2) when a supervisor yelled at him on one occasion. The Court finds summary judgment is not appropriate as to the first allegation of retaliation because, as stated previously, there are questions of fact and credibility surrounding whether the respective routes of Sheppard and Updite were geographically "proximate" or "opposed." Sheppard also contends that the chauffeuring agreement resulted in an

increased workload and stress. These disputed facts, which hinge on credibility determinations, are key in deciding whether Sheppard was subjected to an adverse employment action, that is, a materially adverse action that might dissuade a reasonable worker from engaging in activity protected by the FLSA.

Conversely, summary judgment in favor of Pepsi is appropriate as to Sheppard's claim that a supervisor yelled at him on one occasion. Assuming this allegation to be true, it does not rise to the level of actionable retaliation because it is not an action that might dissuade a reasonable worker from engaging in activity protected by the FLSA. See White, 548 U.S. at 68; 126 S.Ct. at 2415. Instead, this action is the type of trivial harm that the White court separated from material adversity. See id. ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). Accordingly, summary judgment in favor of Pepsi is **granted** as to Sheppard's claim that he was retaliated against when a supervisor yelled at him on one occasion.

### C. Russell.

In the "Statement of Material Facts in Support of Defendant's Motion for Partial Summary Judgment," Pepsi stated:

> 109. The decision-maker on Russell's termination, manager John Lee, did not know about his lawsuit when he made the decision to terminate Russell. (Ex. 27).

Record Document 89-3 at 14. The merchandisers stipulated to this fact, stating that it was "unconditionally undisputed." Record Document 92-2.

In Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999), the Fifth Circuit affirmed summary judgment to an employer on a retaliation claim where the employer

did not know of plaintiffs' protected activity.  The court reasoned:

> The district court properly focused on an important defect in Watts'
> retaliation claim: the lack of evidence on the causation element. At the
> time Kroger allegedly began retaliating against Watts, Kroger did not know
> Watts had engaged in any protected activity.  The district court correctly
> held that Kroger could not retaliate against Watts for making sexual
> harassment complaints, because it did not know she had engaged in
> protected activity. . . .   The record bears out that Watts' schedule was
> changed for the first time on July 17, 1994. She concedes that she did not
> complain of any alleged sexual harassment until July 19, 1994. Watts'
> speculation that the such action constituted retaliatory conduct is not
> sufficient to rebut Kroger's proffered non-discriminatory reason for
> changing her schedule.

Id.  Based on this rationale, Russell's allegation of retaliatory discharge fails because

Lee, the decision-maker as to the termination, did not know about the lawsuit, the

activity protected under the FLSA, when he made the decision to terminate Russell.

Accordingly, summary judgment in favor of Pepsi is **granted** as to Russell's retaliation

claim.

## IV.    Meal Period Claim.

Pepsi seeks summary judgment against five specific merchandisers on the meal

period claim, arguing that Updite, Russell, Sheppard, Pugh, and Stewart admitted in

their depositions that they are not seeking relief in connection with this claim.  See

Record Document 89-2 at 31.  The Court disagrees, as its independent review of the

relevant deposition excerpts does not support a finding that these merchandisers

abandoned their meal period claim.  See Record Document 89, Exhibit 1 at 57-58;

Exhibit 2 at 33; Exhibit 3 at 34-36; Exhibit 4 at 44-46; Exhibit 5 at 28-31.  Instead, the

merchandisers made it clear in their depositions that they believed they were entitled to

time-and-a-half for all overtime hours.  According to the merchandisers, their overtime

hours often included the time *improperly* deducted for meal periods. Accordingly, summary judgment is denied.

The merchandisers seek summary judgment on their claim that Pepsi unlawfully deducted time and withheld payment for 30 minute meal periods that were not taken. Conversely, Pepsi contends that such deductions were justified under Title 29, Code of Federal Regulations, Section 785.19, which provides:

> (a)     Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.

> (b)     It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period.

29 C.F.R. § 785.19. To qualify as a bona fide meal period, employees must be completely relieved from duty for the purpose of eating meals during that period. See Bernard v. IBP, Inc. of Nebraska, 154 F.3d 259, 264 (5th Cir. 1998). To make this determination, the Fifth Circuit applies a "predominant benefit test":

> The critical question is whether the meal period is used predominantly or primarily for the benefit of the employer or for the benefit of the employee. The employer bears the burden to show that meal time qualifies for this exception from compensation.
> ***Whether meal time is predominantly for the benefit of the employer is a question of fact that is ordinarily resolved by the trier of fact after hearing all of the evidence.***

Id. at 264-265 (internal citations omitted) (emphasis added).

Here, the discovery responses of six merchandisers indicate that they spent no

time driving to and from meals.  <u>See</u> Record Document 91, Appendix 0111-0112.  The various merchandisers further provided that they spent twenty to thirty minutes a week eating a meal; spent five to six minutes, two times per week eating a meal; did not spend any time eating meals; would spend approximately five minutes in a drive-thru picking up food one time per week; would eat in the truck while driving to next store; and would eat a snack while driving the truck.  <u>See id.</u>  The merchandisers also point to the deposition testimony of McKinney, the Shreveport area sales manager, regarding meal periods:

> Q:  Do you remember Jeff Sheppard ever complaining to you about never having time to take a lunch break despite the fact that he's – his pay is deducted by 30 minutes each day?
>
> A:  I don't remember that.
>
> Q.  Okay.  Do you remember telling Jeff Sheppard to, you know, just, quote: "Get a bite and go," quote, "we have to do the same thing, too"; do you ever remember telling Jeff Sheppard anything like that?
>
> A:  Yes, I do.  Yes, I remembers that.  That's what I do, you know, I grab a bite to eat and go.
>
> Q:  Okay.  So you remember Jeff Sheppard complaining to you, then, about meal breaks?
>
> A:   Yes, I guess.  Yes, I mean, I told him to grab a bite and go, like I do.  You know, I grab a bite to eat and go.  I drive down the highways eating.

<u>Id.</u> at 0036-0037.

Conversely, Pepsi contends that Section 785.19 "speaks directly to a situation involving an office-bound employee but does not speak much to a situation, like in the instant case, involving employees who work away from the employer's facility, out in the

field." Record Document 102 at 37-38. Pepsi also points to additional evidence that precludes summary judgment, including a declaration from Smith, a current Key Account Manager for Pepsi who previously served as a Region Manager, stating:

> Merchandisers have been, and still are, given a 30-minute meal period on each workday. They can use this meal period whenever they want, wherever they want, with whomever they want, and for whatever they want, although the intended purpose of the meal period if for the Merchandisers to have time to eat lunch. The Merchandisers are not supervised during this meal period, are not required to be at any account during this meal period, and are not required to perform any work during the meal period.

Id., Exhibit L. Pepsi further relies on the legal standard set forth in Bernard, providing that "whether meal time is predominantly for the benefit of the employer is a question of fact that is ordinarily resolved by the trier of fact after hearing all of the evidence." Bernard, 154 F.3d at 265.

Based on the conflict between the evidence proffered by the merchandisers and Pepsi, and cognizant of the Bernard standard, the Court finds that there are genuine issues of material fact precluding the merchandisers motion for partial summary judgment on the meal period claim. It will be for the jury to determine whether the merchandisers' meal periods were predominantly for the benefit of Pepsi or for the benefit of the merchandisers.

## V.    Hours Worked Claim.

The merchandisers claim that they have not been compensated for all hours that they worked. See Record Document 58, ¶¶ 21, 20. Pepsi has moved for summary judgment on an issue connected with this claim, specifically that it accurately recorded the hours worked by merchandisers on weekdays because the merchandisers clocked

in and clocked out on weekdays using a time clock. See Record Document 89-2 at 30. Pepsi does not dispute that the merchandisers are entitled to overtime pay for all hours worked over 40 in a workweek. See id. Instead, Pepsi contends that "the main issue underlying [the] hours worked claim is whether all of the hours worked by the merchandisers have been accurately recorded and accounted for." Id.

The merchandisers oppose Pepsi's motion, arguing that it did not accurately record hours worked by the merchandisers on weekdays. According to the merchandisers, "though Pepsi may have accurately recorded the weekday hours worked by its merchandisers [via the time clock system], it is undisputed that improper deductions were made for meal periods that were not taken by the merchandisers and that Pepsi did not pay for all overtime hours worked." Record Document 91 at 1. The Court has denied summary judgment on the meal period claim, which appears to be directly related to the issue of whether Pepsi accurately recorded the hours worked by merchandisers on weekdays. Thus, summary judgment must also be denied on the hours worked claim in relation to weekdays, as it will be for the jury to determine whether the 30 minute meal period is either a bona fide meal period or compensable time that should be counted as hours worked by merchandisers.

Pepsi maintains that "there is an issue for trial as to whether all hours worked by [m]erchandisers on *weekends* have been recorded and accounted for." Record Document 89-2 at 30. Yet, the merchandisers seek summary judgment as to the weekend hours worked claim, arguing:

> It is undisputed that Pepsi a) did not pay merchandisers for all hours worked on weekends; b) did not keep accurate records of all hours merchandisers worked on the weekends; and c) destroyed the

merchandisers' time sheets indicating actual hours worked on weekends some eight (8) months after this lawsuit was filed.

Record Document 91 at 12.

The merchandisers in Shreveport do not have access to a time clock on weekends. While the merchandisers in Monroe have access to a time clock on weekend mornings, they do not have access to a time clock on weekend afternoons. In lieu of a time clock, the payroll processing for weekend is based on a "Weekend Duty" sheet in Shreveport and the "Merchandiser Daily Report" in Monroe. These facts are undisputed. Notwithstanding, the summary judgment record is replete with genuine issues of material fact regarding the Weekend Duty sheets and Merchandiser Daily Reports and the practices employed by Pepsi supervisors and payroll employees in determining the number of weekend hours worked by merchandisers. The record reveals that there were weekend days when the merchandisers' precise starting and ending work times were accurately recorded on Weekend Duty sheets and Merchandiser Daily Reports and submitted for payroll processing. See Record Document 91, Appendix at 0026, 0264, 0301, 0321; Record Document 102, Exhibit E at 12. Yet, there are numerous instances where incomplete Weekend Duty sheets and Merchandiser Daily Reports were submitted for payroll processing. McKinney testified during his deposition that he instructed payroll to pay merchandisers for only eight hours, regardless of the actual number of hours worked, if the Weekend Duty sheet was incomplete. See Record Document 91, Appendix at 0034-0035. Yet, according to Nicy Gordon, who worked in payroll processing, sometimes the supervisor would tell her to enter eight hours, but other times she would actually follow up with the supervisor or

employee in an attempt to determine the actual hours worked on the weekends.  See id., Appendix 0085-0088.

A thorough review of the summary judgment record, and the fact that most if not all of the relevant Weekend Duty sheets and Merchandiser Daily Reports are no longer in existence, leads the Court to believe that the weekend hours worked claim turns on specific questions of fact and will require the trier of fact to make credibility determinations.  Such facts include whether the Weekend Duty sheets and the Merchandiser Daily Reports were incomplete when submitted and the identity of the weekend supervisor.  It appears that each supervisor had their own customary procedure of determining the hours worked when a merchandiser did not turn in, or turned in an incomplete, Weekend Duty sheet or Merchandiser Daily Report.  Thus, summary judgment must be denied as to the weekend hours worked claim.[10]

---

[10]Because the Merchandiser Worksheets and most of the Merchandiser Daily Reports were destroyed, the merchandisers argue for application of the "records rule" enunciated in Anderson v. Mt. Clemmens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187 (1946), *abrogated by statute on other grounds*.  The Anderson court described the "records rule" as follows:

> [W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. . . .  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.
> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records . . . .  It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.

## CONCLUSION

Based on the foregoing, the Motion for Partial Summary Judgment (Record Document 89) filed by Pepsi is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted as to Sheppard's claim that he was retaliated against when a supervisor yelled at him on one occasion and as to Russell's retaliation claim.  The motion is denied in all other respects.  The Motion for Partial Summary Judgment filed by the merchandisers is **DENIED**.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 24th day of March, 2009.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

Id. at 687-688; 66 S.Ct. at 1192-1193.

While the parties shall be prepared to argue the applicability of the Anderson case at a later date, the Court notes that even if the rule is applied in this matter, the case does not demand entry of summary judgment.  Rather, it requires Pepsi "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  Id.  At this stage, Pepsi has come forward with enough evidence to negate the reasonableness of the inferences the merchandisers argue should be drawn from their evidence on the issue of day rate versus hourly rate.